**OWENS–CORNING FIBERGLAS CORPORATION, Petitioner,**

v.

**Roy MALONE et al., Respondents.**

**OWENS–CORNING FIBERGLAS CORPORATION, Petitioner,**

v.

**Barbara WASIAK, et al., Respondents.**

Nos. 96–0287, 96–0512.

Supreme Court of Texas.

Argued Nov. 21, 1996.

Decided June 5, 1998.

Rehearing Overruled Aug. 25, 1998.

Larry L. Simms, Mark A. Perry, Washington, DC, Kevin F. Risley, Houston, for Petitioner in No. 96-0287.

Kevin F. Risley, N. Terry Adams, Jr., Houston, Larry L. Simms, Mark A. Perry, Washington, DC, for Petitioners in No. 96-0512.

David M. Gunn, Lawrence Madeksho, Robert E. Ballard, Houston, for Respondents in No. 96-0287.

Brent M. Rosenthal, Russell W. Budd, Janice Pennington, Dallas, for Respondents in No. 96-0512.

BAKER, Justice, delivered the opinion of the Court in which GONZALEZ, SPECTOR, ABBOTT and HANKINSON, Justices, join, and in which PHILLPS, Chief Justice, and ENOCH, Justice, join in all but part II.B.1.

We granted applications for writ of error in these product liability cases to consider two issues. First, in *Owens–Corning Fiberglas Corporation v. Malone*, we consider what evidence, beyond a defendant's net worth, is relevant and admissible when a defendant offers the evidence to mitigate punitive damages. Second, in *Owens–Corning Fiberglas Corporation v. Wasiak*, we consider whether the trial court's punitive damage awards, either in this case alone or when aggregated with previous punitive damages awards for the same course of conduct, violate the Fourteenth Amendment's Due Process Clause.

We hold in *Malone* that evidence about the profitability of a defendant's misconduct and previously paid punitive damage awards or previously paid settlement amounts for punitive damages for the same course of conduct is relevant and may be admitted when a defendant offers it to mitigate punitive damages. We nevertheless conclude that the trial court's error, if any, in excluding this evidence was harmless. We conclude in *Wasiak* that neither the punitive damage awards, in this case alone or when aggregat-

ed with other punitive damages OCF has previously paid for the same wrongful conduct, violate the Fourteenth Amendment's Due Process Clause. For the reasons set forth below, we affirm the courts of appeals' judgments.

## I. BACKGROUND

*Malone* involves three consolidated suits for injuries allegedly caused by asbestos-containing products that OCF produced or marketed. The parties tried *Malone* under Texas substantive law. Based on the jury's verdict, the trial court rendered judgment for the plaintiffs for $3.03 million total actual damages and $1.5 million total punitive damages. The court of appeals affirmed the trial court's judgment. 916 S.W.2d 551.

*Wasiak* involves four consolidated asbestos cases against OCF. In two cases, the decedents died of mesothelioma, a cancer related to asbestos exposure. In the other two cases, the plaintiffs were diagnosed with asbestosis, a scarring of the lungs caused by exposure to asbestos. The parties tried *Wasiak* under Alabama substantive law. After reducing the jury's verdict to reflect settlement credits from settling defendants, the trial court rendered judgment for the plaintiffs for about $1.6 million total actual damages and about $3.7 million total punitive damages. The court of appeals affirmed the trial court's judgment. 917 S.W.2d 883.

## II. *OCF v. Malone*

### A. OCF's Evidence In Mitigation Of Punitive Damages

In an attempt to introduce mitigating evidence for the jury's consideration, OCF offered evidence from Peter Frank, a certified public accountant, about how much profit it earned from sales of Kaylo (an asbestos-containing insulation product), the adverse economic impact asbestos litigation has had on OCF, its past and future insurance coverage, OCF's out-of-pocket litigation costs, and the total amount of punitive damages awarded against OCF in asbestos litigation. After the trial court decided, over the plaintiffs'

objections [1], that it would only allow Frank to testify about OCF's current net worth, OCF made an offer of proof for a bill of exception. For its offer of proof, OCF tendered the transcript of Frank's previous testimony and certain exhibits, that OCF stated that Frank would use if he were allowed to testify about matters beyond OCF's net worth. The thrust of Frank's prior testimony and accompanying exhibits about punitive damages against OCF was that "enough is enough." The court of appeals held that the trial court did not abuse its discretion when it sustained, in part, the plaintiffs' objections and excluded all but the net worth evidence.

Frank's prior testimony reflects that: OCF had received about 186,000 Kaylo-related asbestos claims; that about 62,000 of those claims were unresolved; that in 1992 alone, OCF received 27,000 claims, the highest annual number yet; that claims were resolved for about $10,000 on average; that OCF's net profit [2] from Kaylo sales totaled about $1.5 million; that OCF's total costs to date due to Kaylo litigation exceeded $1 billion; that these costs have been covered, predominantly, by insurance; that $540 million to $675 million in available insurance remained for unresolved pending and future claims; that OCF's out-of-pocket costs to date for indemnity payments to plaintiffs and litigation expenses was about $20 million; that OCF's financial statements disclosed a $950 million accounting reserve to pay future uninsured Kaylo-related claims; that OCF predicted it would be able to fund this reserve with future earnings; that future unreserved and uninsured costs arising out of asbestos claims would not have a material adverse effect on OCF's financial position; that OCF was solvent, but had a negative net worth; that the original cause of OCF's negative net worth was fending off a hostile takeover bid by the Wicks Corporation; and that, if OCF's earnings trend continued, OCF could work out its negative net worth posture over the next fifteen years.

The Frank transcript does not include testimony about prior punitive damage awards against OCF. Instead, OCF offered an affidavit with attached exhibits from Robert McOmber, a former OCF lawyer, that included this information. OCF offered the McOmber affidavit with attached exhibits (cumulatively "the McOmber affidavit") along with the Frank transcript as its complete offer of proof. In its briefing, OCF asserts that if the trial court had allowed Frank to testify about matters beyond net worth, Frank's testimony, including the McOmber affidavit, would have established that twenty-eight prior Kaylo-related punitive damage judgments totaling $51,710,200 had been awarded against OCF. However, the "enough is enough" evidence shows, and OCF's counsel conceded in oral argument before this Court, that OCF has only *paid* about $3 million in punitive damages for Kaylo-related claims.

OCF argues that the excluded evidence is relevant to the punitive damages determination consistent with the purposes of punishment and deterrence. OCF also argues that the excluded evidence is relevant to the factors that the trial court instructed the jury to consider in determining punitive damages: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the culpability of the wrongdoer; (4) the situation and sensibilities of the parties; and (5) the extent to which the defendant's conduct offends the public's sense of justice and propriety. *See Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981)(the *Kraus* factors); *see also* Tex. Civ. Prac. & Rem.Code § 41.011(statutory adoption of *Kraus* factors for trier of fact's consideration).

### B. Applicable Law And Standard of Review

#### 1. Admissibility of Evidence in Mitigation of Punitive Damages

■ Punitive damages are not designed or intended to compensate or enrich individual

---

1. Plaintiffs objected that OCF's "enough is enough" evidence was speculative, misleading, and that any probative value it had was outweighed by its prejudicial effect.

2. In both *Malone* and *Wasiak*, OCF calculated its profit from Kaylo by subtracting its materials costs, manufacturing costs, equipment costs, labor costs, sales costs, accounting costs, administrative costs, and taxes from its total Kaylo sales from 1954 to 1972.

victims. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 16 (Tex.1994); *see also BMW of North America, Inc. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Instead, the purpose of punitive damages is to punish a party for its "outrageous, malicious, or otherwise morally culpable conduct" and to deter it and others from committing the same or similar acts in the future. *See Moriel,* 879 S.W.2d at 16–17; *Lunsford v. Morris,* 746 S.W.2d 471, 471–72 (Tex.1988).

We have approved the *Kraus* factors as instructions for juries about punitive damages. *See George Grubbs Enters., Inc. v. Bien,* 900 S.W.2d 337, 338 (Tex.1995). Moreover, although we have never considered what type of evidence is admissible to mitigate punitive damages, we have recognized that a "defendant's 'ability to pay' bears directly on the question of adequate punishment and deterrence." *See Lunsford,* 746 S.W.2d at 472; *see also Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 329 (Tex.1993)(Gonzalez, J., concurring)(contending that jury should hear net worth evidence "plus any other evidence" relevant to the amount of punitive damages).

Other courts have held that factors about a party's financial situation beyond net worth are relevant to the punitive damages amount necessary to satisfy the purposes of punitive damages. *See, e.g., Viking Ins. Co. v. Jester,* 310 Ark. 317, 836 S.W.2d 371, 379 (1992)(holding that jury may consider defendant's "financial condition" when assessing punitive damages); *Stevens v. Owens–Corning Fiberglas Corp.,* 49 Cal.App.4th 1645, 57 Cal.Rptr.2d 525, 536–37 (1996)(holding that defendant may inform the jury about other punitive damages awards for the same conduct, but the impact of those awards can only be measured if the awards have actually been paid); *W.R. Grace & Co.—Conn. v. Waters,* 638 So.2d 502, 506 (Fla.1994)(allowing defendant to introduce evidence about previous punitive damage awards in second stage of bifurcated trial); *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854, 868 (Iowa 1994)(allowing for consideration of past awards actually paid by defendant for the same course of conduct); *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 738 P.2d 1210, 1241 (1987)(allowing evidence of other punitive damage awards); *Bennett v. Owens–Corning Fiberglas Corp.,* 896 S.W.2d 464, 468 (Mo.1995)(holding that the defendant's "specific financial condition" is admissible in mitigation of punitive damages); *Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 512 A.2d 466, 480 (1986)(allowing defendants to offer evidence of previously paid punitive damage awards for jury to consider whether the defendant has been sufficiently punished); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 459–60 (1980)(holding that the jury may consider punitive damages, fines, and forfeitures already imposed on the defendant); *Sears v. Summit, Inc.,* 616 P.2d 765, 772 (Wyo. 1980)("Not only may the plaintiff introduce evidence as to the wealth of the defendant, but the defendant may also introduce evidence of impecunity in order to mitigate the award of punitive damages."); *see also* Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 52 FORDHAM L.REV. 37, 59 (1983)("By considering other punishment for the same conduct, along with evidence of the defendant's current financial status, a jury should be able to make a more informed judgment of the amount necessary for punishment and deterrence.").

■ We are persuaded that Texas law should allow defendants to introduce some evidence to mitigate punitive damages. Accordingly, we hold that evidence about the profitability of a defendant's misconduct and about any settlement amounts for punitive damages or prior punitive damages awards that the defendant has actually paid for the same course of conduct is admissible when the defendant offers it in mitigation of punitive damages.[3] Such evidence is relevant

---

3. While we hold that it is the defendant's prerogative to offer such evidence at trial to try to mitigate punitive damages, once a defendant successfully introduces such evidence, the plaintiff may then offer rebuttal evidence about the same matters. As we stressed in *Moriel* when we fashioned a common law right to bifurcation, a defendant that intends to offer evidence in mitigation of punitive damages during trial should announce its intention to do so in a timely fash-

because it better informs the fact finder about the parties' situation and the amount of punitive damages necessary to fairly punish a party and to deter the conduct in question. *See Lunsford,* 746 S.W.2d at 472; *Kraus,* 616 S.W.2d at 910. Allowing such evidence also provides an important "safeguard[ ] to minimize the risk of unjust punishment." *Moriel,* 879 S.W.2d at 17. Of course, this evidence is only relevant and admissible at trial about the amount of punitive damages—usually in the second part of a bifurcated trial. *See* TEX. CIV. PRAC. & REM.CODE § 41.009.

■ Evidence that is not relevant, or is unduly prejudicial, and thus, not admissible to mitigate punitive damages, includes actual damage amounts paid by settlements or by judgments; the number of pending claims filed against a defendant for the same conduct; the number of anticipated claims for the same conduct; insurance coverage; unpaid punitive damages awards for the same course of conduct; and evidence of punitive damages that may be levied in the future. *See* TEX.R. EVID. 403; *Dunn v. HOVIC,* 1 F.3d 1371, 1389–90 (3d Cir.)(en banc), *modified in part,* 13 F.3d 58 (3d Cir.1993)(OCF's "failure to designate particular amounts of the settlements as representing punitive damages makes inclusion of these amounts problematic ... [thus] OCF has failed to prove that the aggregate award of punitive damages against it has been sufficient to meet the twin goals of punishment and deterrence underlying such awards."); *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 281–82 (2d Cir.1990)(rejecting argument that actual damage awards and settlements can be aggregated to establish that successive punitive damages awards are unconstitutional); *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 839 (2d Cir.1967)("[I]t is hard to see what even the most intelligent jury would do with this [evidence about the potential number of similar actions], being inherently unable to know what punitive damages, if any, other juries in other states may award other plaintiffs in actions yet untried."); *Baker v. Armstrong,* 106 N.M. 395, 744 P.2d 170, 173 (1987)("[P]unitive damages liability

coverage is not an asset which can be used to measure true punishment and ... therefore, it should not be considered by the jury in assessing a defendant's financial standing."); *see also Rojas v. Vuocolo,* 142 Tex. 152, 177 S.W.2d 962, 964 (1944)(holding that proof of insurance for the defendant in connection with issues of liability or damages should not be introduced to the jury).

■ OCF cites comment e of the RESTATEMENT (SECOND) OF TORTS § 908 (1979) to support its argument that the fact finder should be allowed to consider *unpaid* punitive damage awards including those awarded in the past and those that *might be* awarded in the many pending claims against OCF. *See* RESTATEMENT (SECOND) OF TORTS § 908 cmt. e (1979). Section 908 provides:

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

RESTATEMENT (SECOND) OF TORTS § 908 (1979). Comment e discusses what evidence the fact finder should properly consider to determine whether punitive damages are appropriate, and if so, the proper award. Comment e lists factors such as the defendant's conduct and motives, the plaintiff's harm, and the defendant's wealth. *See* RESTATEMENT (SECOND) OF TORTS § 908 cmt. e (1979). OCF relies on a part of comment e that suggests that it may also be "appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future...." RE-

---

ion. *See Moriel,* 879 S.W.2d at 30. Once the defendant does so, information which might otherwise be irrelevant and not subject to discovery

becomes both relevant and discoverable. *See generally Ford Motor Co. v. Leggat,* 904 S.W.2d 643 (Tex.1995).

STATEMENT (SECOND) OF TORTS § 908 cmt. e (1979).

While we agree with section 908, we do not subscribe to comment e's suggestion that in considering the amount of punitive damages necessary to satisfy the goals of punishment and deterrence, the fact finder should be allowed to consider *unpaid* punitive damages. *See* RESTATEMENT (SECOND) OF TORTS § 908 cmt. e (1979). As comment e also explains, the "greater weight" should be placed on prior awards. RESTATEMENT (SECOND) OF TORTS § 908 cmt. e (1979). Moreover, as we have concluded, only prior *paid* awards and settlements for punitive damages should be considered by the fact finder. To hold otherwise risks unfair prejudice and jury confusion. *See* TEX.R. EVID. 403; *Roginsky*, 378 F.2d at 839. As commentators have recognized, many punitive damage awards are reduced after trial, reversed on appeal, or settled at a discount. *See* WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF TORT LAW 302–307 (1987) (observing that in product liability cases, "punitive damage awards are more likely to be reversed than are other outcomes" and otherwise noting that "many awards are reduced by the trial judge or on appeal"); Owen, *Punitive Damages in Products Liability Litigation*, 74 MICH. L.REV. 1258, 1324 (1976) (Owen I) (noting that at the conclusion of the MER/29 mass tort litigation, "the only mass disaster products liability litigation that has run its course," only three verdicts included punitive damages and that of those, one was reversed and the other two were substantially reduced on appeal).

Studies also confirm that punitive damage awards are "likely to be greatly reduced by posttrial actions." MICHAEL G. SHANLEY & MARK A. PETERSON, THE INSTITUTE FOR CIVIL JUSTICE, POSTTRIAL ADJUSTMENTS TO JURY AWARDS 36 (1987); *see also* LANDES & POSNER, *supra*, at 304; Galanter, *Real World Torts: An Antidote To Anecdote*, 55 MD. L.REV. 1093, 1115–1130 (1996) (citing several studies about reduction and payment of punitive damages); Milo Geyelin, *Product Suits Yield Few Punitive Awards*, WALL ST. J., Jan. 6, 1992, at B1 (discussing study that revealed that punitive damages are "rarely paid" and otherwise "frequently reduced af-

ter trial"). We also agree with courts that have recognized that the impact of other punitive damages awards can only be measured if they have actually been paid. *See, e.g., Stevens*, 57 Cal.Rptr.2d at 536–37; *Spaur*, 510 N.W.2d at 868; *Fischer*, 512 A.2d at 480; *see also Dunn*, 1 F.3d at 1389–90 (requiring proof of punitive damages "actually paid in the past" and rejecting consideration of "non-final awards of punitive damages" and of settlements where OCF did not segregate settlement amounts paid as punitive damages); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1287–88 (2d Cir.1990) (rejecting defendant's request that appellate court take judicial notice of other punitive damage awards because defendant did not provide any documentation about "exactly how much money they have actually paid in punitive damages").

At oral argument, Malone asserted that, if evidence to mitigate punitive damages is relevant, the trial court should consider it as a legal issue rather than submit it to the fact finder. However, we believe that the fact finder will better perform its role as the community's conscience in determining the proper punitive damages award by considering such evidence. *See* TEX. CIV. PRAC. & REM.CODE § 41.010(b) ("The determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact.") and § 41.011 (providing that in determining exemplary damages, the fact finder shall consider evidence about the parties' situation); *Moriel*, 879 S.W.2d at 30 (leaving question of punitive damages to the jury); *see also Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 408–09 (5th Cir. 1986) (holding that punitive damage award in asbestos case should be left to the jury to decide in the first instance); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901–02 (Tenn. 1992) (establishing criteria for the fact finder to consider during second phase of *Moriel* style bifurcated trial); *Seltzer, supra*, at 41, 60–61 (recognizing jury's role "as the conscience of the community in assessing an amount of punitive damages that reflects the degree of the defendant's culpability"). Consequently, we hold that the fact finder, in the

first instance, should consider properly admitted evidence in mitigation of punitive damages in deciding the amount of punitive damages, if any, to award.

 Whether a punitive damage award violates state common law or is "grossly excessive" in violation of a party's due process rights remains for the courts to decide when properly preserved. *See BMW,* 517 U.S. at 568, 116 S.Ct. 1589 (setting constitutional limits on the size of punitive damages awards); *see also* Owen, *A Punitive Damages Overview: Functions, Problems, and Reform,* 39 VILL. L.REV. 363, 384–85 (1994)(Owen II)(recognizing that adequate jury instructions and appellate review of punitive damages verdicts helps "assure that the standards ... are applied in a manner that is as fair and accurate as possible"); Seltzer, *supra,* at 41(noting that using a bifurcated trial procedure and appellate review helps "assure that juries have a continuing voice in the amount of punishment while providing the safeguards necessary to prevent unfairness to defendants"). Indeed, Texas law requires careful appellate scrutiny of punitive damage awards. *See* TEX. CIV. PRAC. & REM.CODE § 41.013 (regarding judicial review of punitive damage awards); *Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995)(same). Thus, while the fact finder decides whether to award punitive damages, and if so, how much, in the first instance, courts maintain an important role in reviewing such awards.

### 2. Standard of Review

 Evidentiary rulings are "committed to the trial court's sound discretion." *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it rules "without regard for any guiding rules or principles." *Alvarado,* 897 S.W.2d at 754. Trial courts may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* TEX.R. EVID. 403; *State v. Malone Serv. Co.,* 829 S.W.2d 763, 767 (Tex.1992). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling.

*See State Bar of Texas v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989). Moreover, we will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1; *see also Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

### C. ANALYSIS

 While some of OCF's "enough is enough" evidence, such as OCF's net worth and its profits from the sale and manufacture of Kaylo, relates to "the situation of the parties" under *Kraus* and to the size of the punitive damages award necessary to sufficiently punish and deter OCF, other parts are inadmissible. *See Kraus,* 616 S.W.2d at 910; *see also Lunsford,* 746 S.W.2d at 472. The Frank transcript and the McOmber affidavit include evidence about the average value of resolved claims, litigation expenses, and prior payments for actual damages. Evidence about past settlements for actual damages does not necessarily aid the fact finder in deciding what amount of punitive damages will satisfy the policy goals of punishment and deterrence. *See Dunn,* 1 F.3d at 1390–91; *Pittsburgh Corning Corp.,* 901 F.2d at 281–82. As we have explained, evidence of past settlements must specify the amount allocated for punitive damages. Actual damage settlements or awards and litigation expenses in other cases are not relevant to the policy purposes supporting punitive damage awards. *See Dunn,* 1 F.3d at 1390–91; *Pittsburgh Corning Corp.,* 901 F.2d at 281–82. Unlike evidence of other punitive damage settlements or awards against OCF, included as punishment for the same course of conduct, evidence of actual damages and expenses in other cases is inappropriate because each case is fact specific and unrelated to the particular plaintiffs here. *See Pittsburgh Corning Corp.,* 901 F.2d at 281–82; *see also Malone Serv. Co.,* 829 S.W.2d at 769 ("[E]vidence of differing outcomes in unrelated cases ... could cause incalculable prejudice.")(Gonzalez, J., concurring).

 The trial court's ruling also excluded evidence about insurance, 62,000 unresolved asbestos claims, and about twenty-eight judg-

ments for punitive damages totaling almost $52 million, most of which OCF has not paid. Although evidence about pending and estimated future claims and unpaid judgments (including evidence about insurance coverage for those claims or judgments) may be relevant to a defendant's economic condition, the trial court properly excluded evidence of such contingent liabilities, some or all of which may never be paid, on the grounds that such evidence is likely to confuse the issues and to mislead the jury. *See* TEX.R. EVID. 403; *Roginsky*, 378 F.2d at 839; *Stevens*, 57 Cal.Rptr.2d at 537; *Baker*, 744 P.2d at 173. The trial court did not abuse its discretion by excluding evidence about these matters.

■ While we agree with OCF that evidence about the profitability of its misconduct and about punitive damages paid for the same course of conduct should be admissible in mitigation of punitive damages, the record does not support OCF's argument that the trial court's ruling probably caused the rendition of an improper judgment. *See* TEX. R.APP. P. 44.1. As we have detailed, OCF's "enough is enough" evidence does not reveal that imposing punitive damages in this case exceeds the goals of punishment and deterrence. Indeed, the record shows that OCF has only paid $3 million in punitive damages for Kaylo-related claims. Moreover, after the trial court's ruling that OCF could introduce evidence about its negative net worth to help support its "enough is enough" argument, OCF did not introduce any such evidence. OCF essentially passed on its right to present evidence about its financial condition to the jury to support its "enough is enough" argument. Accordingly, we hold that the trial court's error, if any, was harmless error. *See* TEX.R.APP. P. 44.1; *Gee*, 765 S.W.2d at 396. OCF also complains about additional trial court evidentiary rulings that the court of appeals' opinion details. For the reasons the court of appeals expressed, we agree that the trial court's errors, if any, did not cause rendition of an improper judgment. *See* TEX.R.APP. P. 44.1.

Accordingly, we affirm the court of appeals' judgment in *Malone*.

## III. *OCF v. Wasiak*

### A. SINGLE PUNITIVE DAMAGE AWARD AND DUE PROCESS

■ Initially, OCF again complains about the exclusion of Frank's testimony at trial. Here, OCF sought to read into evidence a transcript of Frank's former testimony with accompanying exhibits as its "enough is enough" evidence. In response to the plaintiffs' objection that OCF had not shown Frank's unavailability, OCF's attorneys argued that Frank, a California resident, was not subject to the trial court's subpoena power, and added that Frank was on a European vacation. We agree with the court of appeals when it held that the trial court properly excluded OCF's "enough is enough" evidence because OCF did not establish Frank's unavailability under Texas Rule of Evidence 804 for transcribed testimony from another proceeding. *See* TEX.R. EVID. 804; *Hall v. White*, 525 S.W.2d 860, 862 (Tex.1975); *Cf.* TEX.R. EVID. 801(e)(3)(about use of depositions from same proceeding); *see also Evans*, 774 S.W.2d at 658 n. 5. Also, for the reasons we explained in *Malone*, the trial court's error, if any, in excluding Frank's prior testimony was not harmful.

After the trial, the trial court held a full evidentiary hearing on OCF's motion to set aside or reduce the punitive damage awards. At the posttrial hearing, the trial court heard OCF's evidence, including Frank's live testimony, about its financial condition, including evidence about previous asbestos-related punitive damage awards. That record also shows that, at the time, OCF had only paid $3 million in past punitive damage awards. And again, counsel for OCF conceded this fact at oral argument before this Court. OCF's posttrial evidence shows that it has not paid any punitive damages in Texas or Alabama.

■ OCF first argues that the punitive damage award in this case is unconstitutionally excessive under *BMW of North America v. Gore*.[4] As a threshold matter, Wasiak ar-

---

**4.** Although OCF's point of error states that "the court of appeals erred because the punitive dam-

age awards are excessive under Alabama law," none of OCF's arguments attack the court of

gues that punitive damages are the functional equivalent of compensatory damages in wrongful death cases governed by Alabama law, and, consequently, this Court should not grant OCF constitutional immunity from punitive damages in such cases. While it is true that punitive damage awards in wrongful death cases are accorded special treatment under Alabama law, the damages recoverable are intended to serve a punitive purpose and "are in no sense compensatory." *Gulf, Mobile & Ohio R.R. Co. v. Williams,* 251 Ala. 516, 38 So.2d 334, 336 (1949); *see also Atkins v. American Motors Corp.,* 335 So.2d 134, 144 (Ala.1976) ("Damages [in wrongful death cases] are to be awarded that will punish the tortfeasor for the act and deter him and others from similar future conduct."). Because punitive damage awards in Alabama wrongful death cases are meant to punish and deter, we conclude that the *BMW* constitutional analysis should apply in this case.

### 1. Applicable Law

▪ The Due Process Clause "prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW,* 517 U.S. at 562, 116 S.Ct. 1589. *BMW* marks the first time that the Supreme Court found a punitive damages award so excessive that it violated a party's substantive due process rights. *See BMW,* 517 U.S. at 585–86, 116 S.Ct. 1589. Under *BMW,* even if an assessment of punitive damages is not deemed excessive under governing state law, it may violate a party's substantive due process right to protection from "grossly excessive" punitive damages awards. *See BMW,* 517 U.S. at 568, 116 S.Ct. 1589; *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 430 n. 12, 116 S.Ct. 2211 (1996)(noting that *BMW* provides "an ultimate federal constitutional check for exorbitancy" of punitive

damages). Similarly, we have recognized that, "like criminal punishment, punitive damages require appropriate substantive and procedural safeguards to minimize the risk of unjust punishment." *See Moriel,* 879 S.W.2d at 16–17.

▪ *BMW* establishes three "guideposts" for determining whether a punitive damages award is unconstitutionally excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and punitive damages; and (3) a comparison of the punitive damages awarded and other civil or criminal penalties that could be imposed for similar misconduct. *See BMW,* 517 U.S. at 574–75, 116 S.Ct. 1589; *see also TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20–21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1990). We now apply these guideposts to determine whether the punitive damage judgment here is grossly excessive to the extent it violates OCF's substantive due process rights. In doing so, we are aware that whether the amount of punitive damages is excessive as a pure factual inquiry[5] is beyond this Court's jurisdiction. *See Kraus,* 616 S.W.2d at 910. However, this Court has jurisdiction to determine whether the courts of appeals properly review such factual inquiries. *See Keever,* 915 S.W.2d at 479; *Kraus,* 616 S.W.2d at 910. Moreover, this Court has jurisdiction to decide questions of law like the constitutional substantive due process claims presented here. *See* Tex. Const. art. V, § 3; Tex. Gov't Code 22.001.

### 2. Analysis

▪ First, the degree of reprehensibility of the defendant's conduct is "[p]erhaps the most important indicium" of the reason-

appeals' application of the factors established by *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–25 (Ala.1989)(the *Green Oil* factors); *see also Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986). Rather, OCF's arguments here focus on the *BMW* decision, which was released after the court of appeals' opinion issued in this case.

5. As the court of appeals pointed out, it is significant that OCF does not challenge the factual

sufficiency of the punitive damage award. Instead, OCF challenges its constitutionality. *See* 917 S.W.2d at 894 n. 13; *see also Spaur,* 510 N.W.2d at 865 ("Significantly, OCF does not challenge either the sufficiency of the evidence ... or the excessiveness of the award. Instead, it initially urges that ... multiple punitive damage awards in products liability litigation is per se unconstitutional.").

ableness of a punitive damage award. *See BMW*, 517 U.S. at 575, 116 S.Ct. 1589. Conduct that endangers a person's health or safety merits more punishment than purely economic harm. *BMW*, 517 U.S. at 576, 116 S.Ct. 1589; *see also Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634, 639 (10 th Cir.1996)("The appropriate penalty is no doubt below what would be justified if OXY's conduct caused loss of life, widespread health hazards, or major environmental injury.").

Here, the evidence about OCF's conduct justifies punishment. In the early 1950's, OCF began distributing Kaylo. A few years later, OCF bought the Kaylo line and became both manufacturer and distributor. There is evidence that OCF knew about the dangers of asbestos even before it began selling or manufacturing Kaylo, but nevertheless consciously engaged in a pattern and practice of failing to warn Kaylo users of such dangers. Thus, there is evidence that OCF's conduct over the years displayed an "indifference to or reckless disregard for the health and safety of others," including the plaintiffs here. *See BMW*, 517 U.S. at 576, 116 S.Ct. 1589; *see also Dunn*, 1 F.3d at 1374–76. Consequently, the trial court's judgment does not offend constitutional due process guarantees under *BMW's* first guidepost.

Second, we must examine the ratio of compensatory to punitive damages. *See BMW*, 517 U.S. at 575, 116 S.Ct. 1589; *see also Kraus*, 616 S.W.2d at 910 ("Exemplary damages must be reasonably proportioned to actual damages."). This is the "second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award...." *BMW*, 517 U.S. at 580, 116 S.Ct. 1589. In *BMW*, the punitive damage award (even after reduction by the Alabama Supreme Court) was 500 times the amount of the actual damage award. *See BMW*, 517 U.S. at 582, 116 S.Ct. 1589.

Alabama law does not authorize recovery of compensatory damages for wrongful death claims. *See Cherokee Elec. Coop. v. Cochran*, 706 So.2d 1188, 1193 (Ala.1997)(citing ALA. CODE § 6–5–410 and holding that Alabama law does not allow recovery of compensatory

damages in wrongful death cases). However, Alabama law does permit a decedent's spouse to recover for the loss of consortium that the surviving spouse suffered "between the decedent's injury and death." *Zimmerman v. Lloyd Noland Found.*, 582 So.2d 548, 551 (Ala.1991). Alabama law also permits "survival" damages for the decedent's estate if the decedent had a suit pending at the time of death. *See King v. National Spa and Pool Inst.*, 607 So.2d 1241, 1246 (Ala.1992). Here, the jury awarded compensatory damages to both decedents' (Wasiak and Barnes) spouses for loss of consortium and to the estates for their survival claims.[6] The jury also awarded compensatory and punitive damages to the personal injury plaintiffs (Brownlee and Wingate). The ratios between compensatory and punitive damages for each plaintiff under the jury's verdict were as follows:

| Plaintiff | Compensatory award (Including spouse's Loss of consortium) | Punitive award | Ratio |
|---|---|---|---|
| Wasiak | $700,000 | $2,000,000 | 2.85 to 1 |
| Barnes | 700,000 | 1,500,000 | 2 to 1 |
| Brownlee | 500,000 | 750,000 | 1.5 to 1 |
| Wingate | 125,000 | 100,000 | .8 to 1 |

The trial court reduced the jury's punitive damage awards to the decedents' survivors because under Alabama law, in wrongful death cases (but not personal injury cases), the defendant is entitled to credit settlements from settling defendants against its liability for punitive damages. *See Tatum v. Schering Corp.*, 523 So.2d 1042, 1045 (Ala. 1988). The trial court also reduced all the compensatory awards to reflect the settlement credits.

Under the trial court's judgment, the plaintiffs received about $1.6 million in total compensatory damages and about $3.7 million in total punitive damages, yielding a combined ratio of punitive to compensatory damages of slightly more than 2 to 1. The individual ratios under the judgment are: 2.85 to 1 for the Wasiak plaintiffs; 2.14 to 1 for the Barnes plaintiffs; 1.77 to 1 for the Brownlee plaintiffs; and 1.15 to 1 for the Wingate plaintiffs. Even though the constitutional due process line cannot be "marked by a simple mathematical formula," *BMW*,

---

**6.** OCF did not challenge the propriety of the compensatory damage awards on appeal.

517 U.S. at 582, 116 S.Ct. 1589, we conclude that the ratios between compensatory and punitive damages in this case are well within constitutional limits. *See also TXO Prod. Corp.,* 509 U.S. at 462, 113 S.Ct. 2711 (indicating that a 10 to 1 ratio would not be unconstitutional); *Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032 (holding that ratio of 4 to 1 did not "cross the line into constitutional impropriety").

Third, comparing the punitive damage award with other civil or criminal penalties that could be imposed for comparable misconduct provides a final "indicium of excessiveness." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589. However, unlike *BMW,* which involved deceptive trade practices and slight economic harm, the nature of this personal injury and wrongful death case does not lend itself to a comparison with statutory penalties. *See Continental Trend Resources, Inc.,* 101 F.3d at 640–41 (holding that violation of common law tort duties are not comparable to statutory penalties). Importantly though, judicial decisions at the time of the misconduct are also relevant under *BMW*'s third prong to ascertain whether a defendant had notice that its misconduct could subject it to a large punitive damages award. *See BMW,* 517 U.S. at 584, 116 S.Ct. 1589; *Continental Trend Resources, Inc.,* 101 F.3d at 641. Thus, the question under *BMW* is whether OCF had reasonable notice that its failure to provide warnings about the dangers of Kaylo could result in substantial punishment in the form of punitive damages. *See Continental Trend Resources,* 101 F.3d at 641 (applying *BMW* guideposts on remand after *BMW* decision). Although the notice analysis is difficult to apply because OCF"s misconduct during the 1950's and 1960's occurred before product liability law was mature and before punitive damages as a remedy in product cases was fully assimilated into our jurisprudence, the law has recognized for decades that a supplier has a duty to adequately warn of its product's hidden dangers. *See* Noel, *Products Defective Because of Inadequate Directions or Warnings,* 23 Sw. L.J. 256, 264–67 (1969); *see also* Owen I, *supra,* at 1258; Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products,* 49 U. CHIC. L.REV. 1, 2–3

(1982)(Owen III). Indeed, the original *Restatement* articulated a supplier's duty to warn about a product's dangers. *See* RESTATEMENT OF TORTS § 388 (1934).

The evidence here shows that OCF knew about the dangers of asbestos even before it began selling or manufacturing Kaylo. Moreover, reported cases involving damages caused by defective products gave a manufacturer like OCF notice that its misconduct—here OCF's manufacture of asbestos-containing Kaylo for about 14 years and the distribution of it for almost 20 years without warning of Kaylo's dangers—could subject it to punitive damages. *See, e.g., Standard Oil Co. v. Gunn,* 234 Ala. 598, 176 So. 332 (1937)(affirming punitive damage award for sale of adulterated motor oil); *Birmingham Ry. Light & Power Co. v. Murphy,* 2 Ala. App. 588, 56 So. 817 (1911)(upholding punitive damage award for faulty wiring on street car); *Toole v. Richardson–Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967)(upholding $250,000 punitive damage award for drug manufacturer's failure to warn consumers about known hazards of its product); *Boise Dodge, Inc. v. Clark,* 92 Idaho 902, 453 P.2d 551 (1969)(affirming punitive damage award against auto dealer for misrepresentations about auto); *Moore v. Jewel Tea Co.,* 116 Ill.App.2d 109, 253 N.E.2d 636 (1969), *affd.,* 46 Ill.2d 288, 263 N.E.2d 103 (1970)(affirming punitive damage award against manufacturer because it did not warn consumers of known risk of explosion of can of "Drano" drain-cleaner); *see also* Owen I, *supra,* at 1269 (discussing *Fleet v. Hollenkemp,* 52 Ky. 219 (1852)(involving the sale of an adulterated drug where court upheld punitive damage award)); Wheeler, *A Proposal for Further Common Law Development of the Use of Punitive Damages in Modern Product Liability Litigation,* 40 ALA. L.REV. 919 (1989)(discussing history of punitive damage awards in product liability litigation). And "[i]t has long been established . . . that tortious behavior that is particularly egregious will warrant punitive damages." *Continental Trend Resources, Inc.,* 101 F.3d at 638. Despite the dearth of judicial decisions about punitive damages in products liability cases during the relevant time period, the award in

this case is still constitutionally sound given OCF's knowledge about Kaylo and its continuing failure to warn about Kaylo's hidden dangers.

Although the court of appeals did not have the benefit of *BMW* when it reviewed the punitive damage awards against OCF, applying the *BMW* guideposts reveals that we should not alter the court of appeals' conclusion. We hold that the punitive damage awards here do not, by themselves, violate due process under *BMW*'s standards.

### B. MULTIPLE PUNITIVE DAMAGE AWARDS AND DUE PROCESS

We next consider OCF's claim that any further punitive damage awards levied against it for manufacturing and distributing Kaylo, beginning with the punitive damage awards here, are excessive as a matter of law in violation of the Due Process Clause. OCF argues that continued punitive damage awards for the same course of conduct violate substantive due process because the punishment and deterrence objectives underlying punitive damages have already been achieved by previous punitive damage awards for that course of conduct. OCF contends that because no legitimate purpose is served by additional punitive damage awards against it for manufacturing and distributing Kaylo, continued punitive damage awards, including the ones here, are irrational and arbitrary in violation of the Due Process Clause.

### 1. Applicable Law

Answering this constitutional argument is no easy task. Professor David Owen, who has studied and written about this issue for the last two decades, has observed that the issue "is a problem of enormous complexity which requires much analysis and ingenuity." Owen II, *supra*, at 394. Courts have also expressed concern and frustration about this issue. *See, e.g., Edwards v. Armstrong World Indus.*, 911 F.2d 1151, 1155 (5th Cir.1990) ("If no change occurs in our tort law or constitutional law, the time will arrive when Celotex's [asbestos] liability for punitive damages imperils its ability to pay compensatory claims and its corporate existence."). Of the many courts that have faced this challenge, only one has expressly held that multiple awards of punitive damages for the same conduct violate a defendant's due process rights. *See Juzwin v. Amtorg Trading Corp.*, 705 F.Supp. 1053, 1064 (D.N.J.1989) (*Juzwin I*), *vacated*, 718 F.Supp. 1233, 1234 (D.N.J.1989) (*Juzwin II*) (vacated but abiding by previous ruling "that repetitive awards of punitive damages for the same conduct violate a defendant's due process rights"). Other courts faced with this argument have rejected it for five principal reasons.

First, courts have rejected due process challenges to multiple punitive damage awards by holding that procedural safeguards provide all the protection that is necessary. *See, e.g., Scheufler v. General Host Corp.*, 126 F.3d 1261, 1272 (10 th Cir.1997); *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565, 1571 (6th Cir.1985); *Fibreboard Corp. v. Williams*, 813 S.W.2d 658, 686 (Tex. App.—Texarkana 1991, writ denied). However, we believe that courts must consider multiple punitive damage awards for the same conduct against a party's substantive due process rights. Whether "to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 434–35, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). While a punitive damage award "in an individual case may be fair and reasonable, the cumulative effect of such awards may not be." *Juzwin I*, 705 F.Supp. at 1055. At some point, punitive damages for the same conduct no longer serve to punish and deter, but instead become grossly excessive in violation of the Fourteenth Amendment's Due Process Clause. *See BMW*, 517 U.S. at 568, 116 S.Ct. 1589. Accordingly, we decline to follow these cases.

Second, some courts have rejected substantive due process challenges out of parochial concerns. *See In re School Asbestos Litig.*, 789 F.2d 996, 1001 (3d Cir.1986). These courts reason that a court-imposed limit on punitive damage awards will only affect claimants within their own jurisdiction, prejudicing those claimants and only provid-

ing minimal or arbitrary relief to defendants. *See, e.g., Jackson,* 781 F.2d at 405 ("We believe that the Mississippi Supreme Court would not deny to its own citizens the right to recover that which citizens of dozens of other states are already entitled to recover."); *W.R. Grace & Co.—Conn.,* 638 So.2d at 505 ("Were we to adopt the position advocated by Grace, our holding would not be binding on other state courts or federal courts. This would place Floridians injured by asbestos on an unequal footing with the citizens of other states with regard to the right to recover damages from companies who engage in extreme misconduct."); *Wangen,* 294 N.W.2d at 461 ("[W]e do not believe this court [Supreme Court of Wisconsin] should abandon the concept of punitive damages in products liability suits and ask the citizens of this state to wait for a national law or legislative reform in all fifty states . . . ."); *see also* Jeffries, *A Comment on the Constitutionality of Punitive Damages,* 72 VA. L.REV. 139, 146 (1986)(noting that when a court denies a litigant punitive damages because its opponent has been sufficiently punished by previous judgments for the same course of conduct, there is no guarantee that other courts will follow suit thereby disadvantaging its own citizens relative to claimants in other jurisdictions).

Third, courts have rejected OCF's argument to avoid what those courts perceive as inequitable results. As Judge Friendly pointed out over thirty years ago, it does not "seem either fair or practicable to limit punitive recoveries to an indeterminate number of first-comers, leaving it to some unascertained court to cry, 'Hold, enough,' in the hope that others will follow." *Roginsky,* 378 F.2d at 839–40; *see also Fischer,* 512 A.2d at 478 (reasoning that the fact that a defendant injured a large number of people should not relieve it from multiple punitive damage awards); *Davis v. Celotex Corp.,* 187 W.Va. 566, 420 S.E.2d 557, 565 (1992)("[I]t seems highly illogical and unfair for courts to determine at what point punitive damage awards should cease."); Kemp, *The Continuing Appeal of Punitive Damages: An Analysis of Constitutional and Other Challenges to Punitive Damages, Post–Haslip and Moriel,* 26 TEX. TECH. L.REV. 1, 68 (1994)(noting that

limiting multiple punitive damage awards "unfairly advantages the first plaintiff or first few plaintiffs to obtain judgments for punitive damages to the detriment of all others"). *But c.f.* Owen I, *supra,* at 1325 (questioning the supposed unfairness of rewarding the initial plaintiffs to a greater extent than subsequent plaintiffs).

While we sympathize with the second and third reasons for rejecting OCF's constitutional challenge, these concerns should not stand in the way of protecting a defendant's due process rights. "Due process mandates at all times, in all circumstances, and for all defendants, 'fundamental fairness' at the hands of the law." Jeffries, *supra,* at 152. As we recognized in *Moriel,* our duty is "to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment, while at the same time preventing punishment that is excessive or otherwise erroneous." *Moriel,* 879 S.W.2d at 17. "[A]t some point, some jurisdiction must face up to the realities of the asbestos crisis and take a step that might . . . lead others to adopt a broader view." *Dunn,* 1 F.3d at 1399 (Weiss, J., dissenting). Erecting a constitutional barrier to additional punitive damages awards against a particular defendant for the same course of conduct may, to some extent, allow only those plaintiffs who win the "race to the courthouse" to recover punitive damages. However, punitive damages are not designed to compensate individuals, but are only intended to punish tortious conduct and to deter its repetition. *See Moriel,* 879 S.W.2d at 16; *see also BMW,* 517 U.S. at 568, 116 S.Ct. 1589; Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures,* 69 VA. L.REV. 269, 292 (1983)("As courts have uniformly held, no plaintiff has a right to punitive damages . . . the purpose of punitive damages is to vindicate the public interest, not that of a particular plaintiff."). Therefore, when engaging in a substantive due process analysis of multiple punitive damage awards for the same conduct, courts should focus on the defendant's due process rights and whether the twin aims of punishment and deterrence have been adequately served rather than on plaintiffs' remedies. *See Dunn,* 1 F.3d at 1402

(Weiss, J., dissenting); *Wilson v. Dukona Corp., N.V.,* 547 So.2d 70, 73 (Ala.1989) ("[T]he focus is on the plaintiff with regard to the propriety of the compensatory damages award, and on the defendant with respect to the propriety of any assessment of punitive damages.").

Fourth, some courts have decided that no single court is capable of crafting an acceptable solution to the national problem of multiple punitive damages in mass tort litigation, and have suggested that legislative action is the answer. *See, e.g., Dunn,* 1 F.3d at 1386 (collecting state cases and noting that "both state and federal courts have recognized that no single court can fashion an effective response to the national problem flowing from mass exposure to asbestos products."); *Cantrell v. GAF Corp.,* 999 F.2d 1007, 1017 (6th Cir.1993)(expressing view "that relief from multiple punitive damage awards should not be sought from a federal court sitting in a diversity action but, rather, from the legislature under whose law the action is decided"); *Jackson,* 781 F.2d at 406 ("The relief sought by [the asbestos defendant] may be more properly granted by the state or federal legislature than by this Court."); *Keene Corp. v. Kirk,* 870 S.W.2d 573, 582 (Tex.App.—Dallas 1993, no writ)("We too conclude that the higher courts and the appropriate legislative bodies should resolve such policy considerations.")(citing *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1096 (5 th Cir.1991)); *W.R. Grace & Co.,* 638 So.2d at 505 ("Any realistic solution to the problems caused by the asbestos litigation in the United States must be applicable to all fifty states. It is our belief that such a uniform solution can only be effected by federal legislation."); *Fischer,* 512 A.2d at 480 ("At the state court level we are powerless to implement solutions to the nationwide problems created by asbestos exposure and litigation arising from that exposure.").

It may be that a truly uniform solution can only be fashioned by either the Supreme Court or Congress. Nevertheless, the difficulty or enormity of the task does not grant us leave to avoid OCF's properly preserved due process challenge under applicable constitutional principles and to ensure that its

due process rights are not violated. *See Moriel,* 879 S.W.2d at 16–17. Indeed, a state court's interpretation of federal law about such a challenge is no less important than that of the federal court of appeals in its circuit. *See Lockhart v. Fretwell,* 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring). Courts should not wait for congressional or legislative action to correct errors made by the courts themselves. "Mistakes created by courts can be corrected by courts without engaging in judicial activism. It is judicial paralysis, not activism, that is the problem in [mass tort cases involving successive punitive damages awards]." *Dunn,* 1 F.3d at 1399 (Weiss, J., dissenting); *see also* Owen III, *supra,* 60 n. 227.

Finally, courts have rejected due process challenges to multiple punitive damage awards not because such challenges are necessarily unsound as a matter of constitutional law, but because the defendant failed to preserve error on the issue, there was not an adequate record to show a due process violation, or, whatever limits due process may impose on multiple punitive damage awards, that limit clearly was not surpassed on the facts presented. *See, e.g., Racich v. Celotex Corp.,* 887 F.2d 393, 398 (2d Cir.1989)(error not preserved); *Pittsburgh Corning Corp.,* 901 F.2d at 281–82 (no due process violation on record presented); *Dunn,* 1 F.3d at 1389 (same); *Leonen v. Johns–Manville Corp.,* 717 F.Supp. 272, 285 (D.N.J.1989)(same); *Palmer v. A.H. Robins Co.,* 684 P.2d 187, 216 (Co.1984)(same). Here, OCF preserved its arguments, and as a result of the posttrial evidentiary hearing, the record is adequate for our review.

Although we recognize that other courts have struggled with the issue and have discussed valid reasons for rejecting OCF's due process challenge, we join the courts and commentators that have acknowledged that repeatedly imposing punitive damages on the same defendant for the same course of wrongful conduct may implicate substantive due process constraints. *See, e.g., Dunn,* 1 F.3d at 1385 ("The principal issue impelling us to take this otherwise routine product liability case in banc is the effect of succes-

sive punitive damages awards in mass tort cases arising from the same course of conduct: We, as well as other courts, have expressed concerns in that regard."); *King v. Armstrong World Indus., Inc.*, 906 F.2d 1022, 1033 (5th Cir.1990) ("With some misgivings, the panel holds that it is bound [by previous Fifth Circuit decisions]" to reject defendant's argument that multiple punitive damage awards for the same misconduct violated constitutional protections.); *Racich*, 887 F.2d at 398 ("We agree that the multiple imposition of punitive damages for the same course of conduct may raise serious constitutional concerns, in the absence of a limiting principle."); *In re School Asbestos Litig.*, 789 F.2d at 1005 ("[P]owerful arguments have been made that, as a matter of constitutional law or of substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts."); *In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718, 728 (E.D.N.Y.1983) ("There must ... be some limit, either as a matter of policy or as a matter of due process, to the amount of times a defendant may be punished for a single transaction."); *In re Northern Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 526 F.Supp. 887, 899–900 (N.D.Cal.1981), *rev'd on other grounds*, 693 F.2d 847 (9th Cir.1982) ("A defendant has a due process right to be protected against unlimited multiple punishment for the same act."); *Tetuan*, 738 P.2d at 1244 ("The concerns expressed in *Roginsky* of multiple punitive damage awards in mass accident or products liability cases may require consideration by this court at some future time."); Owen III, *supra*, at 60 n. 227 ("As the total punitive damages assessed against the company in different actions mount, there should come a point when the aggregate of such punishment will be deemed sufficient as a matter of law."); Seltzer, *supra*, at 55 ("The aggregate amount of multiple awards ... can reach a level so fundamentally unfair and destructive that any additional awards above that level should not be permitted."); Koenig, *Punitive Damage "Overkill" After TXO Production Corp. v. Alliance Resources: The Need for a Congressional Solution*, 36 Wm. & Mary L.Rev. 751, 763 (1995) ("The Supreme Court ...

could rule that multiple awards trigger 'a general concern of reasonableness' and violate substantive due process because they go beyond what is necessary to deter and punish.").

The Supreme Court has not considered at what point multiple punitive damages awards arising from the same course of conduct are unconstitutional as a matter of substantive due process. However, if a single punitive damages award becomes unconstitutional when it can fairly be categorized as "grossly excessive" in relation to a state's legitimate interests in punishment and deterrence, it follows that the aggregate amount of multiple awards may also surpass a constitutional threshold. *See BMW*, 517 U.S. at 568, 116 S.Ct. 1589; *see also Dunn*, 1 F.3d at 1404 (Weiss, J., dissenting). Even before *BMW* held that an individual punitive damage award could exceed constitutional boundaries, many courts and commentators (as we have cited) agreed or expressed concerns, that at some point, the aggregate amount of multiple punitive damage awards becomes fundamentally unfair in violation of due process guarantees. *BMW* simply lends additional support to the view that multiple punitive damage awards against a party for the same course of conduct can surpass constitutional limits under the Fourteenth Amendment. "The aggregate effect of such awards may reach far beyond their purpose to punish and deter, becoming what has been coined 'overkill.'" Jones et al., *Multiple Punitive Damage Awards for a Single Course of Wrongful Conduct: The Need for a National Policy to Protect Due Process*, 43 Ala. L.Rev. 1, 1 (1991).

In deciding whether multiple punitive damage awards against OCF for the same course of conduct—here Kaylo-related claims—offend OCF's due process rights, courts cannot "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032. However, we believe the following criteria, derived from *BMW* and from the *Green Oil* factors the Supreme Court endorsed in *Haslip*, are proper for posttrial constitutional review of whether the purposes

of punishment and deterrence have been adequately served by previously paid punitive damage awards for the same course of conduct: (1) the degree of reprehensibility of the defendant's misconduct; (2) the profit earned by the defendant from its misconduct; (3) the defendant's financial position; and (4) criminal sanctions, if any, imposed for the same conduct. *See BMW*, 517 U.S. at 574–75, 116 S.Ct. 1589; *Haslip*, 499 U.S. at 22, 111 S.Ct. 1032; *Green Oil*, 539 So.2d at 223–24; *see also Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897, 908–10 (1991). Like a single punitive damage award, aggregate awards "enter the zone of arbitrariness" under the Due Process Clause "[o]nly when [the aggregate] award[s] can fairly be characterized as 'grossly excessive' " in relation to the legitimate interests in punishment and deterrence. *See BMW*, 517 U.S. at 568, 116 S.Ct. 1589.

We agree with the Second and Third Circuits, neither of which has foreclosed the possibility of a successful substantive due process challenge under an aggregate punitive damages award theory, that such a challenge can properly be evaluated only if the defendant develops a sufficient record. *See Dunn*, 1 F.3d at 1389; *Pittsburgh Corning Corp.*, 901 F.2d at 281. " 'Only with [sufficient] factual information can the judge determine that the aggregate of prior awards punishes the entirety of the wrongful conduct to the limit of due process.' " *Dunn*, 1 F.3d at 1389 (quoting *Pittsburgh Corning Corp.*, 901 F.2d at 281). In a posttrial review to decide whether a punitive damages award, when aggregated with previously paid punitive damage awards for the same course of conduct, is unconstitutionally excessive, trial courts may consider evidence beyond what is admissible during the trial. After the trial, the danger of unfair prejudice, confusion of the issues, or misleading the jury no longer exists. Moreover, the issue is then one of law—at what point do multiple punitive dam-

age awards arising from the same course of conduct violate due process. Here, the trial court properly allowed OCF to present its "enough is enough" evidence when Frank testified at the posttrial hearing. The court of appeals also considered Frank's posttrial testimony. Using the criteria we have gleaned from *BMW* and *Green Oil*, we now examine the record, including the evidence from the posttrial hearing, to determine whether due process requires an end to further Kaylo-related punitive damage awards against OCF in Texas.

### 2. Analysis

First, and most important, a court should give considerable weight to the degree of reprehensibility of the defendant's conduct. *See BMW*, 517 U.S. at 575, 116 S.Ct. 1589. "[T]he duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct," are all relevant in gauging reprehensibility. *See Haslip*, 499 U.S. at 21, 111 S.Ct. 1032 (discussing *Green Oil* factors). As we discussed when examining the individual punitive damage award in this case, the court of appeals upheld the trial court's judgment finding that OCF's conduct demonstrated indifference to the health and safety of others for many years. This finding weighs in favor of allowing additional punitive damages awards against OCF. *See BMW*, 517 U.S. at 576, 116 S.Ct. 1589. The punitive damages paid by OCF thus far are not "grossly out of proportion to the severity of the offense." *See Haslip*, 499 U.S. at 22, 111 S.Ct. 1032.

Second, a court should examine the profitability of the wrongful conduct. *See Haslip*, 499 U.S. at 22, 111 S.Ct. 1032 (discussing *Green Oil* factors). The $3 million in punitive damage awards previously paid by OCF [7] is double the amount of profits OCF claims it earned from its Kaylo sales. Puni-

---

7. At oral argument, OCF pointed out that since the trial court rendered judgment here, at least $14 million in punitive damages has been levied against it in other cases involving Kaylo. Also, in its briefing, OCF indicated that "[t]ens of millions of dollars in punitive damages already have been awarded against Owens–Corning for the company's involvement with Kaylo." How-

ever, these awards do not factor into our analysis because they are not part of the trial court record. Consequently, there is no proof that these awards have actually been paid. *See University of Texas v. Morris*, 162 Tex. 60, 344 S.W.2d 426, 429 (1961); *see also Johnson*, 899 F.2d at 1287–88.

tive damages, however, are not necessarily confined to the amount of profits. *Dunn,* 1 F.3d at 1391; *Stevens,* 57 Cal.Rptr.2d at 534. Where evidence shows that product sales resulted in widespread and devastating injuries and little profit in relation to the seller's overall financial condition, merely taking away that profit may or may not impose much punishment on the seller. *See* Morris, *Punitive Damages in Tort Cases,* 44 HARV. L.REV. 1173, 1191 (1931)("[A] penalty which would be sufficient to reform a poor man is likely to make little impression on a rich one. . . ."). As other courts considering OCF's same arguments have observed, because Kaylo sales approximated only 2 percent of OCF's total sales, and an even smaller percentage of its total profits, "Kaylo profits do not provide an accurate indication of the likely punitive impact of a punitive damage award against OCF." *Stevens,* 57 Cal.Rptr.2d at 535. Thus, the evidence about the profits, or lack thereof, from OCF's Kaylo sales does not support OCF's due process argument.

■ Third, because courts should ensure that punitive damage awards do not exceed an amount necessary to accomplish society's goals of punishment and deterrence, a court should examine the defendant's financial position. *See Haslip,* 499 U.S. at 22, 111 S.Ct. 1032 (discussing *Green Oil* factors). Here, the trial court and the court of appeals considered OCF's "enough is enough" evidence from the posttrial hearing and determined that OCF's financial position is not so precarious that further punitive damages awards against it should be disallowed. We agree. The evidence reveals that OCF is a solvent, healthy company. In 1993, shortly before this case was tried, OCF reported to its shareholders that "[a]t the end of 1991, our company was valued by the market at $932 million; 12 months later, the market value of the company was in excess of $1.5 billion, an increase of 60%!" Moreover, in March 1993, OCF reported to the SEC that "the additional uninsured and unreserved costs which may arise out of pending personal injury and

property damages asbestos claims and additional similar asbestos claims filed in the future will not have a materially adverse effect on the Company's financial position." [8] Thus, we cannot say that the prior paid punitive damage awards against OCF, combined with the punitive damage awards here, have exceeded the goals of punishment and deterrence.

■ Fourth, previously imposed criminal sanctions for the same conduct are relevant in determining whether a defendant has been sufficiently punished and deterred. *See Haslip,* 499 U.S. at 22, 111 S.Ct. 1032 (discussing *Green Oil* factors). However, there is no evidence about any such sanctions in this case.

OCF has not shown that the aggregate punitive damage awards against it have exceeded the "twin goals of punishment and deterrence underlying such awards" to constitute a violation of its substantive due process rights. *Dunn,* 1 F.3d at 1390. Given the nature of OCF's conduct and the concomitant injuries suffered by the plaintiffs, OCF's relatively stable financial position, and the fact that OCF has actually paid only $3 million in punitive damages for the same conduct, we cannot say that the punitive damage awards here, when aggregated with other paid punitive damage awards against OCF, can be characterized as grossly excessive and beyond the legitimate interests of punishment and deterrence. We therefore conclude, as have other courts when considering OCF's same arguments under similar facts, that "the evidence produced by OCF falls short of demonstrating a due process violation." *Spaur,* 510 N.W.2d at 867 (record reflected that OCF had paid $3 million in punitive damages); *see also Stevens,* 57 Cal. Rptr.2d at 539–40 ("Without any showing of punitive damages actually assessed and paid [by OCF], the evidence fell far short of demonstrating 'overkill.' ").

We affirm the court of appeals' judgment in *Wasiak.*

---

8. OCF reported this same information to its shareholders in its 1991 and 1992 annual reports.

## IV. CONCLUSION

We hold in *Malone* that evidence about the profitability of a defendant's misconduct and about past settlements that specify amounts for punitive damages or about other paid punitive damage awards for the same course of conduct is relevant and admissible for the fact finder to consider when the defendant offers such evidence in mitigation of punitive damages. We also hold that the punitive damage awards in *Wasiak* do not violate the Fourteenth Amendment's Due Process Clause, either by themselves, or when aggregated with other punitive damages previously paid by Owens–Corning Fiberglas for the same conduct. We affirm the courts of appeals' judgments.

PHILLIPS, C.J., filed an opinion concurring in the judgment only in which ENOCH, J., joined.

HECHT, J., filed an opinion concurring in the judgment only.

OWEN, J., also filed an opinion concurring in the judgment only.

PHILLIPS, Chief Justice, joined by ENOCH, Justice, concurring.

I concur in the Court's judgment and join in its opinion except for the discussion regarding the admissibility of prior, unpaid punitive damage awards. For the reasons explained by the Court, I agree that such awards should *generally* not be admissible when offered by a defendant to mitigate punitive damage liability. Because such awards are often reduced after trial or on appeal, admitting them into evidence would often cause unfair prejudice and confusion.

There may be rare instances, however, where this rationale does not apply. If a defendant has engaged in a course of conduct resulting in repetitive punitive damage awards against it, and the defendant can demonstrate that such punitive awards *have been* regularly upheld on appeal, then those awards, even if unpaid at time of the current trial, should be admissible as mitigating evidence. The risk of prejudice from admitting the awards is no longer present in this situa-

tion. To the contrary, the defendant is at risk of unfair prejudice if the punitive awards are not admitted.

Therefore, rather than setting forth a hard-and-fast rule, as the Court has done, I would leave room for the admissibility of unpaid punitive awards in exceptional cases.

HECHT, Justice, concurring in the judgment.

My most serious reservation about the Court's opinion is its conclusion that evidence of pending and future claims and unpaid punitive damage awards should never be admissible. Comment e to Section 908 of the *Restatement (Second) of Torts* reaches the opposite conclusion:

> Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards.[1]

My initial concern is that the Court's rejection of comment e is entirely gratuitous. The evidence of future punitive damages awards offered in these cases is not such that the judgments would be affected under the Court's opinion. Rather than rejecting comment e out of hand, the Court could just as easily argue that even if comment e were followed, the result in these cases would be no different. The Court must go out of its way to disavow comment e's application, not only in the present cases where it makes no difference, but in any cases, ever. In these the first cases in which the subject has been raised, I find it hard to understand how a categorical rejection of a rule the respected *Restatement* has endorsed for almost two decades can be justified.

The Court gives two reasons for rejecting the *Restatement* position. One is that "many punitive damage awards are reduced after trial, reversed on appeal, or settled at a

---

1. RESTATEMENT (SECOND) OF TORTS § 908, cmt e (1979).

discount." [2] That is true, of course, but the same can be said for any litigated liability. The mere fact that future liabilities are uncertain does not excuse their being reported and estimated routinely in financial statements. Something is wrong with the argument that juries who must determine past and future mental anguish damages on very little solid evidence cannot even hear evidence of potential punitive damage exposure. To the question, can a jury hear evidence of possible future suffering in determining future mental anguish, the Court would unhesitatingly answer yes. To the question, can a jury hear evidence of lost future earning capacity based on how long a plaintiff is likely to live and work, the Court's answer would likewise be unequivocally affirmative. To the question, can a jury hear evidence of potential punitive damages exposure based on experience to date, the Court answers no. If any principle joins these positions, it is stretched far too thin to be visible.

While I certainly do not argue for the admission of speculative evidence in these or any other cases, it seems to me that the *Restatement* is exactly right in suggesting that evidence of a future risk of punitive damages *can be* definite enough to be submitted to the jury. When a party has defended multiple lawsuits arising out of the same subject matter, a sufficient pattern of awards and payments may develop for future liability to be estimated with reasonable reliability. In such instances I see no reason why a jury should be kept any more ignorant of the evidence than, say, the defendant's potential investors or lenders. Indeed, it would be improper to exclude such evidence. If it is essential that potential investors in a public company know its risks of liability for

punitive damages (as well as actual damages), why is that same information irrelevant to a jury in assessing punitive damages? On the other hand, I can just as easily conceive of circumstances in which the risk of potential punitive damages liability would be so remote or speculative that the probative value of any evidence the jury could be given would be far outweighed by its likely prejudicial effect. Comment e does not prohibit exclusion of evidence of future punitive damages awards; it only allows admission of such evidence. That the risk of punitive damages liability may sometimes be uncertain is reason to exclude particular evidence, but no reason to abolish the rule allowing it in other circumstances.

The second reason that the Court gives for rejecting the *Restatement* position is that others have. Again, that is true, but those who have are in a distinct minority. The weight of authority, not surprisingly, supports the *Restatement.*

The Model Uniform Products Liability Act recognizes a defendant's potential exposure to other claims for punitive damages and other sanctions among the factors to be considered by the court in fixing the amount of punitive damages. The Act calls for consideration of "the *total effect* of other punishment imposed or likely to be imposed upon the product seller as a result of the misconduct, including punitive damage awards to persons similarly situated to the claimant and the severity of criminal penalties to which the product seller has been or may be subjected".[3] As the accompanying analysis explains,[4] the Act draws from an earlier Minnesota statute,[5] which in turn drew upon the factors suggested by Professor David G. Owen in 1976.[6] At least Kansas,[7] Oregon,[8]

---

2. *Ante* at 42.

3. MODEL UNIFORM PRODUCT LIABILITY ACT § 120(B)(7) (1979) (reprinted in 44 FED.REG. 62714, 62748 (1979)(emphasis added)).

4. 44 FED.REG. at 62748–62749.

5. MINN.STAT. ANN. § 549.20(3) (West Supp.1978).

6. David G. Owen, *Punitive Damages in Products Liability Litigation,* 74 MICH. L.REV 1258, 1324 (1976).

7. KAN. STAT. ANN. §§ 60–3701, 60–3702 (West 1988) (factors to be considered by court in fixing amount include "total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected").

8. OR.REV.STAT. § 30.925 (1979) (factors for fact finder include "the total deterrent effect of other punishment imposed upon the defendant as a

Minnesota,[9] Mississippi,[10] and Montana [11] all have similar statutory language.

Case law, too, recognizes the relevance of past and potential exposure to additional awards for the same misconduct as an antidote to overkill concerns, sometimes as part of the review applied by courts, and other times as relevant evidence which could be presented to a jury. High courts in at least seven states—Alaska,[12] Colorado,[13] Florida,[14] Minnesota,[15] Oregon,[16] West Virginia,[17] and Wisconsin [18]—have noted the significance of such awards. Comment e has also been favorably viewed in numerous intermediate appellate courts.[19] Only a few federal courts

result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected.").

9. MINN.STAT. ANN. § 549.20(3) (West Supp.1998) (any award of punitive damages is to be measured by factors including " the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject").

10. MISS. STAT. ANN. § 11-1-65 (West 1993) (among other factors, jury may consider "any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages" and judge, in reviewing award, may consider "[i]n mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct").

11. MONT. STAT. § 27-1-221 (West 1997) (including "previous awards of punitive or exemplary damages" and "potential or prior criminal sanctions . . . based upon the same wrongful act").

12. *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 48 n. 17 (Alaska 1979), *modified*, 615 P.2d 621, *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981) (approving Professor Owen's factors in reviewing punitive damage awards).

13. *Palmer v. A.H. Robins Co.* 684 P.2d 187, 215–216 (Colo.1984) (suggesting as a safeguard against "overkill" that a jury in a bifurcated proceeding could consider "the amount of any unsatisfied or satisfied past punitive awards as well as the past and present financial condition of the defendant").

14. *W.R. Grace & Co. v. Waters*, 638 So.2d 502, 506 (Fla.1994) (providing that "evidence of previous punitive awards may be introduced by the defendant" during the second stage of a bifurcated trial).

15. *Gryc v. Dayton–Hudson Corp.*, 297 N.W.2d 727, 739, 741 (Minn.1980), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980) (permitting instructions that allowed the jury to consider "[t]he probability that compensatory damages might be awarded against defendants in

other cases" and the degree to which the defendant had already been punished).

16. *State ex rel. Young v. Crookham*, 290 Or. 61, 618 P.2d 1268, 1272–1274 (1980) (noting that jury consideration of prior and potential punitive damage awards exists as an alternative solution to the "overkill" problem ).

17. *Davis v. Celotex Corp.*, 187 W.Va. 566, 420 S.E.2d 557, 564–566 (1992) (accepting comment e but declining to consider "overkill" argument because record was insufficiently developed).

18. *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 459–460 (1980) (stating that the "jury may consider compensatory and punitive damages . . . already imposed on the defendant or likely to be imposed on the defendant").

19. *See Stevens v. Owens–Corning Fiberglas Corp.*, 49 Cal.App.4th 1645, 57 Cal.Rptr.2d 525, 537–38 (1996) (accepting comment e but holding that no evidence to support mitigation was offered); *Farrall v. A.C. & S. Co.*, 558 A.2d 1078, 1082 (Del.Super.Ct.1989) (stating that "consideration must be given to the deterrence resulting from the current and prospective suits against defendant"); *Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242, 253 (Fla.Dist.Ct.App.1984) (suggesting that "evidence of the adverse effects . . . caused by the award of punitive damages in this and other pending asbestos cases is admissible in avoidance or mitigation of punitive damages"); *Kochan v. Owens–Corning Fiberglass Corp.*, 242 Ill.App.3d 781, 182 Ill.Dec. 814, 610 N.E.2d 683, 694–695, 697 (1993) (refusing to mitigate a punitive damage award because the manufacturer failed to present evidence of potential liability in other cases); *Lipke v. Celotex Corp.*, 153 Ill. App.3d 498, 106 Ill.Dec. 422, 505 N.E.2d 1213, 1220 (1987) (determining that courts are to consider, *inter alia*, defendant's potential liability when reviewing a punitive damage award) (citing *Hazelwood v. Illinois Cent. Gulf R.R.*, 114 Ill.App.3d 703, 71 Ill.Dec. 320, 450 N.E.2d 1199, 1207, 1208 (1983)); *Unified School Dist. No. 490 v. Celotex Corp.*, 6 Kan.App.2d 346, 629 P.2d 196, 206 (1981) (suggesting that comment e provided an alternative solution to prevent "overkill" problem); *Brotherton v. Celotex Corp.*, 202 N.J.Super. 148, 493 A.2d 1337, 1344 (App.Div. 1985) (stating that "evidence of the effect of punitive recovery [is] admissible to mitigate the size of the award"); *Martin v. Johns–Manville*

have discussed comment e in this context.[20]

A number of commentators have also discussed the relevance of other claims in determining punitive damages.[21]

The cases cited by the Court are a mixed bag. In *Dunn v. HOVIC*,[22] the court rejected OCF's due process challenge, pointing out that OCF at a minimum should have put on evidence showing how much it had actually paid toward the punitive damage verdicts listed in its post-trial affidavits. The court also concluded that OCF had failed to show that it would be unable to pay future awards of compensatory or punitive damages. The court pointed to an Annual Report suggesting a declining severity in the nature of recent claims, and that OCF " 'anticipates achieving a gradual reduction in per case indemnity payments.' "[23] Nevertheless, in determining whether to grant remittitur, the court expressly took into consideration *all* of the factors listed in comment e, including the multiplicity of claims.[24] Although the trial court had reduced punitive damages from $25,000,000 to $2,000,000, the appellate court concluded that insufficient consideration had

been given to the effect of successive punitive damages claims. That was the factor, "above all," that led the appellate court to reduce the award to $1,000,000.[25]

The Court's reliance on *Spaur v. Owens–Corning Fiberglas Corp.*[26] is similarly flawed. Citing *Dunn,* the court agreed that "past awards actually paid" should be considered in reviewing punitive damages awards, but the court did not say that that was the sole factor courts should consider. Similarly, the court in *Johnson v. Celotex Corporation*[27] concluded that defendant failed to support its due process challenge, observing that defendant had failed to document how much had actually been paid. *Johnson* did not, however, state that this information alone was relevant. Only in *Fischer v. Johns–Manville Corp.*[28] may it fairly be implied that the court chose not to include unpaid, past awards, or potential future awards. Again, however, nothing in the court's opinion prohibited consideration of such evidence in other cases.

Other cases the Court cites are more directly opposite its position. In *Stevens v. Owens–Corning Fiberglas Corp.*,[29] the court

---

Corp., 322 Pa.Super. 348, 469 A.2d 655, 665 n. 17 (1983), *vacated on other grounds*, 508 Pa. 154, 494 A.2d 1088 (1985) (allowing the jury to "consider the defendant's past and potential future liability for punitive damages").

**20.** *Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir.1993); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357 (E.D.Pa.1982); *see also Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832 (2d Cir.1967).

**21.** *See* Jane Mallor & Barry Roberts, *Punitive Damages: Toward a Principled Approach*, 31 Hastings L.J. 639, 665, 669 (1980) (proposing that judge determine punitive damage award "in view of the total punishment to which the defendant is subject, giving more weight to prior awards"); Clarence Morris, *Punitive Damages in Tort Cases*, 44 Harv. L.Rev. 1173, 1194–1198 (1931); *supra* note 6, at 1319; Tom Riley, *Punitive Damages: The Doctrine of Just Enrichment*, 27 Drake L.Rev. 195, 213, 253 (1978) (suggesting that "evidence of civil fines and punitive damage awards in other cases growing out of the same event should be admissible"); Richard A. Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control*, 52 Fordham L.Rev. 37, 58–60 (1983) (arguing that one way to prevent punitive damages overkill would be to "inform each jury of other punitive damages awards already imposed or that may be imposed in future upon a mass tort defendant"). *But see* James D. Ghiardi & John J. Kircher, 1

Punitive Damages· Law and Practice §§ 5.42, 6.09 (1990) (opining that juries should "consider prior awards of punitive damages against the defendant as well as the potential for future awards"); Alan Schulkin, Note, *Mass Liability and Punitive Damages Overkill*, 30 Hastings L.J. 1797, 1800–1801, 1806–1807 (1979) (rejecting idea of informing jury, and advocating instead using past awards as credits); Roger H. Trangsrud, *Joinder Alternatives in Mass Tort Litigation*, 70 Cornell L.Rev. 779, 841–843 (1985) (rejecting approach of informing jury of past and potential punitive damage awards as prejudicial and unworkable).

**22.** 1 F.3d 1371, 1390–91 (3d Cir.) (en banc), *modified in part*, 13 F.3d 58 (3d Cir.1993).

**23.** *Id.* at 1390.

**24.** *Id.* at 1391.

**25.** *Id.*

**26.** 510 N.W.2d 854, 868 (Iowa 1994).

**27.** 899 F.2d 1281, 1287–88 (2d Cir.1990).

**28.** 103 N.J. 643, 512 A.2d 466, 480 (1986)

**29.** 49 Cal.App.4th 1645, 57 Cal.Rptr.2d 525, 536–537 (1996).

actually cited comment e with approval and concluded that this evidence should have been presented to the jury. And in *Roginsky v. Richardson–Merrell, Inc.,*[30] the trial judge instructed the jury to consider the potential number of similar claims, given the potentially wide effect of the defendant's actions.

In sum, case law from other jurisdictions can in no way be said to support the Court's position in the present cases. On the contrary, the overwhelming weight of authority supports comment e.

The Court's rejection of comment e is not only unnecessary; it is ill-founded. Because I cannot join in this aspect of the Court's analysis, I concur only in the Court's judgments in these cases.

OWEN, Justice, concurring in the judgment.

I concur in the judgment. It is unnecessary for the Court to decide whether evidence of pending and future claims or evidence of unpaid punitive damages awards is ever admissible. *See* at 54 (Hecht, J., concurring). Because those questions should be decided if and when they are squarely presented and fully briefed, I do not join in the Court's opinion or either of my concurring colleagues' opinions.